## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## WILSON DIVISION

| IN THE MATTER OF: | |
|---|---|
| New Bern Riverfront Development, LLC | Case No. 09-10340-8-JRL<br>Chapter 11 |
| Debtor | |
| Disclosure Statement For Plan Of Reorganization Dated December 30, 2010 | |

Now comes New Bern Riverfront Development, LLC (the "Debtor"), pursuant to 11 U.S.C. Section 1125 and Rule 3016 of the Federal Rules of Bankruptcy Procedure, and respectfully provides the following Disclosure Statement regarding the Debtor's Plan of Reorganization Dated December 30, 2010 (the "Plan"). Capitalized terms are defined in the Plan and shall have the meaning set forth therein. **A copy of the Plan is attached hereto as Exhibit 1 and incorporated by reference.**

## INTRODUCTION

On November 30, 2009 (the "Petition Date"), the Debtor filed a voluntary petition seeking relief under Chapter 11 of the Bankruptcy Code and an Order for relief was entered. The Debtor has filed the Plan as a plan of orderly liquidation, pursuant to which the pending litigation involving the construction of the SkySail Condominiums will be pursued to final judgment or settlement, and the remaining condominium units will be sold. The proceeds realized from these two sources will be the sole means by which the Debtor will pay secured and unsecured creditors, as set forth in the Plan and summarized below. All creditors and other parties in interest are encouraged to read the Plan carefully and thoroughly, and to review the Plan with their attorneys or other advisors to ascertain its terms, provisions, and conditions and the effect of the Plan on any claims or interests which such persons may possess.

Pursuant to the Bankruptcy Code, this Disclosure Statement has been presented to and conditionally approved by the Court. Such approval is required by statute and does not constitute a determination by the Court as to the desirability of, or the value, adequacy, or suitability of any consideration offered under the Plan, but does indicate that the Court has determined that the Disclosure Statement contains adequate information to permit those

claimants and other parties in interest whose acceptance of the Plan is solicited pursuant to this Disclosure Statement to make an informed judgment about the Plan.

The Debtor prepared this Disclosure Statement to disclose that information available which, in the Debtor's opinion, is material, important and necessary to an evaluation of the Plan, and the material herein contained is intended solely for this purpose and the use of known creditors and equity interest holders of the Debtor. This Disclosure Statement may not be relied upon for any purpose other than a determination of how to vote on the Plan. Furthermore, the matters addressed and the discussions contained in this Disclosure Statement are not necessarily sufficient for the formulation of a judgment by any creditor or equity interest holder of whether the Plan is preferable to any alternative thereto. However, the Debtor supports the Plan for the reasons explained herein and encourages each creditor, equity interest holder, or other party in interest to accept the Plan by timely returning a ballot in favor of the Plan.

The Disclosure Statement is submitted in accordance with § 1125 for the purpose of soliciting acceptance of the Plan from holders of certain classes of claims and equity interests. The persons whose acceptance is sought are those whose claims or interests are "impaired" by the Plan; *i.e.*--those whose claims or equity interests are altered by the Plan or who will not receive under the Plan the allowed amounts of their respective claims or equity interests in cash. Holders of those claims and interests which are not "impaired" are automatically deemed to have accepted the Plan.

If the Plan is rejected by one or more impaired classes of claims or equity interests, the Plan or a modification thereof may still be confirmed by the Court if the Court determines, among other things, that the Plan does not discriminate unfairly and is fair and equitable with respect to the rejecting class or classes of claims or interests impaired by the Plan. The Debtor will request such a determination (commonly referred to as a "cram down") if the Plan or modification thereof is not accepted by one or more of the impaired classes of claims or interests.

If the Plan or any modification thereof is not accepted by one or more of the impaired classes of claims or interests and is not confirmed by the Court pursuant to the cram down provisions of the Bankruptcy Code, the Debtor may seek to modify the Plan or may convert this case to a proceeding under Chapter 7, in which event the Chapter 7 trustee would wind down operations, liquidate all assets and pursue all necessary litigation. By separate Order served on all parties in interest, the Court has set a hearing to consider confirmation of the Plan.

A creditor or equity interest holder, in order to vote, must file a Proof of Claim or Interest on or before the date set as the "bar date" for filing all claims. The bar date for filing claims against the Debtors is, as applicable, (i) April 11, 2010 with respect to all creditors except a governmental unit, (ii) May 29, 2010 with respect to a governmental unit, and (iii) with respect to claims arising from the rejection of any lease or executory contract, sixty (60) days after the Confirmation Date, or such other (whether earlier or later) deadline as may be set by the Court generally or with respect to any specific lease or contract rejected.

Any creditor or equity interest holder whose claim or interest is listed in the schedules filed by the Debtor and not identified as disputed, unliquidated or contingent is deemed (to the extent so scheduled) to have filed a claim, and absent objection such claim is deemed allowed and entitled to vote.

A creditor or equity interest holder may vote to accept or reject the Plan by filling out and mailing (as instructed thereon) the ballot which has been provided with this Disclosure Statement. The Court has set the time by which ballots must actually be filed; and, any ballots received after such time may not be counted. Regardless of whether a creditor or interest holder votes against the Plan, or whether the creditor or interest holder votes at all, such persons will be bound by the terms and treatment set forth in the Plan if the Plan is confirmed by the Court.

Allowance of a claim or interest for voting purposes does not necessarily mean that all or a portion of the claim will be allowed or disallowed for distribution purposes. The Debtor or any party in interest may file an objection to a claim, which will then be allowed or disallowed by the Court after notice and an opportunity for hearing. Tax consequences of any of the transactions proposed by the Plan will depend upon the individual circumstances applicable to each creditor, equity interest holder, or other party in interest, and must of necessity include factors beyond the Debtor's knowledge. A general discussion of potential tax consequences is contained in the Disclosure Statement.

The various claims of creditors and interests of equity interest holders are all treated under the proposed Plan. There are additional significant provisions contained throughout the Plan that impact the treatment of creditors and equity interest holders--please read the Plan carefully to fully understand its terms. The Plan proposes segregation of the creditors into separate classes, with an additional class comprising the equity interests.

The Debtor or others may solicit your vote for or against the Plan. The cost of any solicitation by the Debtor will be borne by the Estate. No other additional compensation shall be received by any party for any solicitation other than as disclosed to the Court.

**Consummation Of The Plan Is Subject To Numerous Conditions And Variables, And There Can Be No Assurance That The Plan, As Contemplated, Will Be Effectuated. No Representations Or Assurances Concerning The Plan Are Authorized By The Debtors Other Than As Set Forth In This Disclosure Statement. Any Representations Or Inducements Made By Any Person To Secure Your Vote Which Are Other Than Herein Contained Should Not Be Relied Upon By You In Arriving At Your Decision, And Such Additional Representations Or Inducements Should Be Reported To Counsel For The Debtor, Who In Turn Shall Convey Such Information To The Court For Such Action As May Be Deemed Appropriate.**

Certain materials contained in this Disclosure Statement may have been taken directly from other, readily accessible instruments or digests of other instruments. In addition, other information may be made available, upon reasonable written request, to creditors or other parties in interest having standing to request such information. While the Debtor made every effort to retain the meaning of any such instruments or documents or the portions thereof reiterated herein, you are advised that any reliance on the contents of such other instruments or documents should be predicated on a thorough review of the instruments or documents themselves, including the Plan.

## VOTING

If you are in one of the classes of creditors or other parties in interest whose interests are affected by the Plan, it is important that you vote. To vote to accept or reject the Plan, creditors and other persons or entities having claims against the Debtor falling within any of the impaired classes should indicate their acceptance or rejection on the appropriate ballot. Any persons holding claims in more than one impaired class must file one ballot for each such class. Additional ballots may be obtained by proper written request to John A. Northen, Northen Blue, L.L.P., Post Office Box 2208, Chapel Hill, North Carolina 27515-2208.

A class of claims will have accepted the Plan if it is accepted by class members holding at least two-thirds (2/3) in amount and more than one-half (½) in number of the allowed claims of such class voting on the Plan. A class of equity interests will have accepted the Plan if it is accepted by class members holding at least two-thirds (2/3) in amount of the allowed interests in

such class voting on the Plan. You are, therefore, urged to fill in, date, sign, and promptly mail the enclosed ballot furnished to you.

**Please Be Sure To Properly Complete The Form And Legibly Identify The Name Of The Claimant Or Equity Interest Holder. Executed Ballots Must Be Received On Or Before The Return Date Set Forth In The Ballot. Completed Ballots Should Be Returned To The Address Specified On The Ballot. Since Mail Delays May Occur, It Is Important That The Ballot Or Ballots Be Mailed Or Delivered Well In Advance Of The Date Specified. Any Acceptances Or Rejections Of The Plan Received After The Date May Not Be Included In Any Calculation To Determine Whether The Creditors And Equity Interest Holders Have Voted To Accept Or Reject The Plan.**

**This Is A Solicitation By The Debtor Only And Is Not A Solicitation By The Attorneys, Accountants, Or Other Professionals Who May Be Employed By The Debtor, And The Representations Made Herein Are Solely And Exclusively Those Of The Debtor And Not Of Such Attorneys, Accountants, Or Other Professionals.**

## BACKGROUND AND HISTORY OF THE DEBTOR.

The Debtor is the developer of SkySail Condominium, a 121 residential condominium (plus 1 commercial/non-residential unit) located on Middle Street on the waterfront in historic downtown New Bern, North Carolina ("Riverfront Project"). The Debtor sells the SkySail Condominiums (collectively, the "Sale Properties") in the ordinary course of business. As of the Petition Date, 42 condominiums have been sold, 52 condominiums are under contract, and certain unsold condominiums are occasionally rented on a short-term basis by the Debtor.

In conjunction with the acquisition and development of the Sale Properties, the Debtor arranged financing with Wachovia Bank, National Association ("Wachovia"). Wells Fargo Bank, N.A., successor by merger to Wachovia Bank, N.A. ("Wells Fargo") holds a deed of trust to secure the funds advanced to complete the improvements. Upon information and belief, Wells Fargo is owed approximately $21 million (the "Wells Fargo Indebtedness") secured by first mortgage liens on the Sale Properties which have an aggregate value of between $21 million and $31 million. No recent appraisals of the Sale Properties have been obtained, and the actual fair market value of the Sale Properties is difficult to ascertain due to the current economic conditions, lack of recent sales, and uncertainties as to construction or design defects arising from the pending litigation.

The Debtor contracted with Weaver Cooke Construction, LLC ("Weaver Cooke") to act as the general contractor on the Riverfront Project pursuant to a construction contract between the parties dated July 27, 2006 ("Construction Contract"). Weaver Cooke filed a claim of lien in

the amount of $2,344,072 against the Sale Properties pursuant to Chapter 44A of the North Carolina General Statutes which the Debtor disputes. The Weaver Cooke lien is junior to the lien of Wells Fargo.

There also are other lien claims filed against the Sale Properties by subcontractors (the "Lien Claimants") who supplied materials and/or labor for the purpose of constructing the improvements located on and thus an affixed part of the Sale Properties. Upon information and belief, the inchoate lien rights of the Lien Claimants are disputed, unliquidated, of unknown and uncertain priority, junior to the liens of Wells Fargo, and dependent upon and subsumed within the purported lien of Weaver Cooke.

Prior to the Petition Date, the Debtor instituted litigation in the Superior Court Division, Wake County, North Carolina (the "Construction Litigation") against Weaver Cooke, certain subcontractors hired by Weaver Cooke, and Travelers Casualty Surety Company of America ("Travelers"), the company that is the surety under certain payment and performance bonds provided by Weaver Cooke pursuant to the Construction Contract. In the Construction Litigation, the Debtor, among other things, is seeking to recover judgment against Weaver Cooke and Travelers, jointly and severally, for damages arising out of Weaver Cooke's breach of contract, and to have the liens filed against the Sale Properties by Weaver Cooke and the Lien Claimants discharged and declared void. A more detailed summary of the Construction Litigation is provided below.

## PLAN SUMMARY

**The Following Is A Brief Summary Of Certain Provisions Of The Plan And Should Not Be Relied On For Voting Purposes In Lieu Of A Thorough And Comprehensive Review Of The Actual Plan Itself. The Summary Does Not Purport To Be Complete. Creditors And Equity Interest Holders Are Urged To Read The Plan To Ascertain The Effect Of The Plan On Their Claims And Interests And The Other Provisions Of The Plan. Creditors And Equity Interest Holders Are Further Urged To Consult With Their Attorneys, Tax Advisors, Financial Consultants, Or Other Professionals In Order To Understand More Fully The Plan Or The Effect Of The Plan As To Their Particular Situation.**

The Plan contemplates that the best opportunity for creditors lies in (i) completion of the Construction Litigation, by settlement or trial, and (ii) marketing and sale of the Sale Properties in the ordinary course of business. Wells Fargo has agreed to fund the costs of operations and litigation, as a protective advance under its loan documents. The proceeds realized from the

Construction Litigation and the Sale Properties will be applied to pay Wells Fargo in full, then to any junior lien held by Weaver Cooke to the extent it has a valid claim, and the balance of such proceeds will then be applied to unsecured claims, pro rata.

If the Plan is confirmed, a claims review process regarding Allowed Claims is anticipated to take at least 120 days after the Confirmation Date, and the determination of pending litigation may take somewhat longer. Additional provisions of the Plan deal with Executory Contracts, Objections to Claims, Funding of the Plan, and Releases and Discharges. Pursuant to §1145(a), no specimen subscription agreement, offering memorandum or circular, or prospectus has been prepared because no outside third party has been solicited for purposes of contributing capital to fund the restructuring of the Debtor.

The Debtor desires that this Plan be a consensual plan, with all classes of creditors voting to accept the Plan by the requisite majorities required under §1126. In the event any class does not accept the Plan, however, the Debtor intends to request that the Plan be confirmed by the cram down provisions of §1129(b) with respect to such dissenting class or classes. The Debtor reserves the right to modify the Plan pursuant to §1127, consistent with the requirement that the Plan, as modified, meets the requirements of §1122 and §1123.

**Classification and Treatment of Claims and Interests.**

For purposes of the Plan, Claims and Equity Interests are divided into the following Classes and will receive the treatment summarized below and set forth in detail in the Plan. A schedule of estimated claims is attached hereto as **Exhibit 2.** The Reorganized Debtor may prepay any Allowed Claim, in part or in full, at any time and without penalty:

**Administrative Claims**

Administrative Claims shall be allowed upon due request or application and in such amounts as may be determined by the Court after notice and hearing. Attorneys, accountants and other professionals retained by the Debtors or by an official committee shall be compensated for services rendered in such capacity and reasonably necessary to the administration of this estate, upon an hourly basis and at their customary hourly rates or in such amounts as may be determined by the Court, but not to exceed reasonable compensation for such services. The holders of Allowed Administrative Claims shall be paid in cash on the Effective Date or within thirty days after the same can be determined and, if necessary, allowed by the Court. Due to the size and complexity of the Construction Litigation, it is difficult if not impossible to predict the

amount of such claims with any degree of certainty, and the Debtors have shown in the attached projections only the amount estimated for such claims which will be due and payable upon confirmation.

**Priority Tax Claims**

Allowed Priority Tax Claims may consist of federal or state taxes, which shall be paid in cash, with interest at the applicable statutory rate, and in quarterly or more frequent installments over a period not exceeding five (5) years from and after the Petition Date. Allowed Priority Tax Claims may also consist of ad valorem property taxes due with respect to parcels owned by the Debtors, which taxes shall be paid upon the earlier of (i) a sale of real property subject to the statutory lien securing such taxes, or (ii) the date such taxes are last due and payable without penalty.

**Classes Of Claims**

**Class 1** shall consist of the Secured Claim of Wells Fargo Bank, N.A., successor by merger to Wachovia Bank, N.A. ("Wells Fargo") of approximately $21 million (the "Wells Fargo Indebtedness") secured by a first lien upon the Sale Properties, as evidenced by a proof of claim filed by Wells Fargo (Claim No. 32) to which the relevant loan documentation is attached (the "Wells Fargo Loan Documents"). This Class of Claims is impaired.

Wells Fargo will fund all approved costs of administration, including, without limitation, allowed attorneys' fees and costs, taxes, condo association operating deficits, and maintenance costs, with all costs being treated as post-petition financing and a protective advance under the Note. Wells Fargo also will fund all post-confirmation carrying costs, including, without limitation, allowed attorneys' fees and costs, taxes, condo association operating deficits, and maintenance costs, with all costs being a protective advance under the Note. Finally, Wells Fargo shall pay the Debtor's litigation costs, with all costs being a protective advance under the Note, and shall have the sole authority to retain counsel to prosecute and defend the litigation.

From and after the Effective Date, the outstanding principal amount of the Wells Fargo Indebtedness shall bear interest at the contract, non-default rate as specified in the Wells Fargo Loan Documents, and the Wells Fargo Indebtedness shall be paid from (i) recoveries from the litigation (by settlement or otherwise), and (ii) from the Net Sale Proceeds of the Sale Properties. Upon the earlier of two (2) years from the Effective Date or completion of the pending litigation,

unless otherwise extended by Wells Fargo in its sole discretion, and to the extent the Note is not paid in full, Wells Fargo shall be permitted to foreclose on its Deed of Trust.

**Class 2** shall consist of the Secured Claim of Weaver Cooke Construction, LLC of approximately $2.4 million (the "Weaver Cooke Claim") arising from the contract for design and/or construction of the Sale Properties, and secured by a second lien on the Sale Properties, as evidenced by a proof of claim filed by Weaver Cooke (Claim No. 29). This Class of Claims is impaired.

The Weaver Cooke Claim is disputed and shall be allowed, if at all, in such amount as shall be determined (i) by Final Order of the Court, or (ii) as agreed by the parties subject to approval by the Court after notice and hearing. Weaver Cooke's claim of lien upon the Sale Properties shall be transferred to the Net Sale Proceeds and shall be cancelled of record within thirty (30) days after the Effective Date. Commencing with closings which occur after the Effective Date, ten percent (10%) of the Net Sale Proceeds shall be held in escrow to secure payment of such claim to the extent allowed but only after payment of the senior lien of Wells Fargo.

**Class 3** shall consist of the Allowed Unsecured Claims, including the unsecured portion of any claims listed herein as secured but which are determined to be unsecured by order of the Court or applicable law after (a) valuation or liquidation of property serving as Collateral to said claimant, or (b) avoidance of any Lien securing such claim. This Class of Claims is impaired.

Holders of Allowed Unsecured Claims will be paid from any Net Sale Proceeds remaining after payment in full of (i) the secured claim of Wells Fargo and (ii) the secured claim of Weaver Cooke. At this time, the Debtor is unable to project that any funds will be available for payment of Unsecured Claims; however, if the Plan is not confirmed and Wells Fargo is permitted to foreclose on the unsold units, there would be no other assets or funds available for payment of these claims.

**Class 4** shall consist of Claims arising from an alleged breach by the Debtor of a prepetition contract to sell one or more Sale Properties. This Class of Claims is impaired.

Persons who are parties to prepetition contracts to purchase one or more Sale Properties ("Contract Purchasers"), and asserting claims based upon an alleged breach by the Debtor of such contracts, may elect one of the following treatment options: (A) the contract will be assumed by the Debtor with the express consent of the Contract Purchaser, in which event the

parties shall proceed with closing in accordance with the contract terms within thirty (30) days after the Effective Date; (B) the contract will be rejected by the Debtor with the express consent of the Contract Purchaser, in which event the Debtor shall retain the earnest money deposit and each party shall release the other from any and all claims, including but not limited to a waiver and release of any claim arising from the rejection of the contract.

In the absence of an election by the Contract Purchaser of either Option A or Option B, the contract shall remain in place subject to assumption or rejection by the Debtor pursuant to Section 365 of the Bankruptcy Code and each party shall retain all legal and equitable rights and remedies subject to the provisions of the Bankruptcy Code and the Plan. In the event the contract is rejected and the Contract Purchaser has a claim allowed by Final Order, such claim shall be treated as a Class 3 Allowed Unsecured Claim.

The Debtor has resolved most if not all of the disputed purchase contracts, on the basis that the contract purchaser will waive any claim against the Estate.

**Class 5** shall consist of the existing equity interests. The holders of equity interests are (i) Sanjay Mundra, 30%, (ii) Dicky S. Walia, 30%, (iii) H. Paul Singh, M.D., 10%, and (iv) Harinderjit Singh, 30%. The equity interests will remain in place, subordinate to the payment of Allowed Claims, and the Debtor expects there will be no distribution to holders of equity interests.

**MEANS FOR EXECUTION OF THE PLAN**

The Debtors shall execute and consummate the Plan as follows:

All tangible and intangible assets of the Debtor shall vest in the Reorganized Debtor as of the Effective Date. Wells Fargo will advance funds necessary to pay costs of administration, and to pay for operations and litigation costs after the Effective Date, all as a protective advance under the Note. The Net Sale Proceeds derived from the Sale Properties, together with any recoveries from the pending civil action by the Debtor against Weaver Cooke and other parties (the "Construction Litigation"), will be the sole means to repay Wells Fargo for the protective advances and to fund the payment of Allowed Claims under the Plan.

The Reorganized Debtor will retain a consultant, approved by Wells Fargo (the "Consultant"), to manage post-confirmation operations and to sell and convey the Sale Properties. The Consultant shall work with the Debtor and Wells Fargo in managing post-confirmation operations. The Debtor and its managers shall fully cooperate with Wells Fargo and

the Consultant in the management of the property and the litigation and be available to Wells Fargo and the Consultant as may reasonably be requested by Wells Fargo and/or the Consultant. The Consultant shall have the ability and authority to sell units, and shall have sole control over the asking price and sale price for each unit. The Debtor and its managers shall execute any documents reasonably necessary for the Consultant to manage the property and the litigation and to sell and convey the Sale Properties, including, without limitation, deeds and other closing documents necessary to convey any units. The Consultant will invoice Wells Fargo for its services and Wells Fargo will pay all invoices, with such amounts being a protective advance under the Note.

The Construction Litigation shall be pursued to its conclusion, by final judgment or settlement, in the Court. Wells Fargo shall oversee and manage the pending litigation involving the Debtor.  Wells Fargo shall pay the Debtor's litigation costs, with all costs being a protective advance under the Note, and shall have the sole authority to retain counsel to prosecute and defend the litigation. A summary of the Construction Litigation (*New Bern Riverfront Development, LLC v. Weaver Cooke Construction, LLC,* Case No.: 10-00023-8-JRL) is as follows:

In this Adversary Proceeding, which was commenced as a civil action in Wake County Superior Court on March 10, 2009, New Bern Riverfront Development, LLC (the "Debtor") is seeking to recover damages for alleged deficiencies in the design and construction of a condominium project in New Bern, SkySail Luxury Condominiums ("SkySail" or the "Project") and for delay. The dispute arises out of a construction contract entered into between Debtor and Weaver Cooke Construction, LLC ("Weaver Cooke") on or about July 27, 2006.

In a First Amended Complaint, which was filed with leave of court on May 6, 2010, Debtor alleges, among other deficiencies, that Weaver Cooke failed properly to design and construct the post-tensioning concrete system (the "PT System") and swimming pool, and that J. Davis Architects, PLLC ("J Davis," the architect of record) and Fluhrer Reed, PA ("Fluhrer Reed," the engineer of record) failed properly to identify and respond to the deficiencies in the design of the PT System.  Debtor also alleges that the deficiencies in the design and construction of the PT System have caused failures in the structure of and adversely affected the structural integrity of the buildings constructed as part of the Project.  Debtor further alleges that Weaver Cooke and Travelers Casualty and Surety Company of America ("Travelers," the surety which issued a Performance Bond for the Project) failed properly to respond to the deficiencies in the design and construction of the PT System and swimming pool after such deficiencies became apparent and, with respect to Travelers, after Weaver Cooke had defaulted on its obligations under the construction contract and the employment of Weaver Cooke properly was terminated.  NBRFD asserts claims against Weaver Cooke (the general contractor) seeking to recover on theories of breach of contract and unfair and deceptive trade practices and seeking declaratory relief; against Travelers seeking to recover for breach of the obligations imposed by a Performance Bond and

seeking declaratory relief; against J. Davis and Fluhrer Reed seeking to recover on theories of breach of contract and negligence, respectively; and against National Erectors Rebar, Inc. f/k/a National Reinforcing Systems, Inc. (the subcontractor of Weaver Cooke that actually designed and constructed the PT System in issue) seeking to recover on a theory of negligence.

Debtor is seeking to recover damages in excess of $10,000.00. The precise amount of damages sustained by Debtor will be determined by the remedial action needed to bring the work in conformity with the requirements of the operative contracts. This currently is under investigation, and the precise amount of Debtor's damages, therefore, has not yet been determined. Debtor also seeks a declaration that liquidated damages properly have been assessed in an amount of $6,000.00 for each day between the date on which Weaver Cooke was required by the construction contract to have substantially completed all of the work and the date on which this actually was achieved (at least 277 days). Debtor also is seeking to have damages trebled, and to recover interest, attorneys' fees, and costs.

On May 27, 2010, Weaver Cooke filed an Answer to First Amended Complaint, Counterclaims, Crossclaims, and Third-Party Complaint. In this pleading, Weaver Cooke generally denies most of the factual allegations in the Debtor's First Amended Complaint and liability; asserts a number of defenses, including (among others) substantial and material breach of contract by Debtor; asserts counterclaims against Debtor seeking to recover the alleged unpaid balance owed on the construction contract ($2,344,071.92) on theories of breach of contract, quantum meruit, and unjust enrichment, to enforce a related Claim of Lien, and to recover for an alleged unfair and deceptive trade practice; and asserts cross-claims seeking to recover contribution and indemnity from J. Davis, Fluhrer Reed, and National Erectors Rebar, Inc. Weaver Cooke also asserts (by way of Third-Party Complaint) claims against SkySail Owners Association, Inc. (the homeowners association of SkySail) seeking to enforce Weaver Cooke's Claim of Lien; and against Wachovia Bank, National Association and Wells Fargo & Company (as the successor to Wachovia Corporation, referred to collectively as "Wachovia") seeking to enforce a lien on funds committed to Debtor for the construction of the Project but not disbursed. Weaver Cooke is seeking to recover damages in an amount of $2,344,071.92, trebled, with interest, attorneys' fees and costs.

Also on May 27, 2010, Travelers filed an Answer to First Amended Complaint and Counterclaims. In this pleading, Travelers, like Weaver, Cooke generally denies most of the factual allegations in the Debtor's First Amended Complaint and liability; asserts a number of defenses, including (among others) substantial and material breach of contract by Debtor and failure to satisfy the conditions precedent of the Performance Bond; and asserts counterclaims against Debtor and Wachovia seeking a declaration that Travelers is discharged from the obligations imposed by the Performance Bond and to recover damages from Wachovia. Travelers is seeking judgment discharging it of any obligations under the Performance Bond, and to recover damages in excess of $10,000.00 from Wachovia.

On June 16, 2010, Debtor filed a motion seeking to have Weaver Cooke's Counterclaims based on theories of quantum meruit, unjust enrichment, and unfair and deceptive trade practices dismissed pursuant to Rule 12(b)(6). Weaver Cooke filed a response on July 19, 2010. And NNBR filed a reply on July 28, 2010. Debtor has not yet fined a reply to Weaver Cooke's Counterclaims. However, Debtor will deny most of the factual allegations and liability, and will

assert a number of defenses, including (among others) a defense that, in the context of the cost-plus construction contract for the Project, Weaver Cooke has submitted unsubstantiated charges to Debtor in an amount in excess of $3,000,000.00. Also on June 16, 2010, Debtor filed a Reply to Travelers Counterclaims, denying most of the factual allegations and liability, and asserting a number of defenses.

The Debtor was originally represented by Donalt J. Eglinton and other members of Ward & Smith, P.A., who prepared the litigation summary set forth above. Mr. Eglinton and his firm sought and were given leave to withdraw from further representation of the Debtor in this matter, due to non-payment of approved legal fees and costs. The Debtor is presently represented by Daniel K. Bryson and other members of Lewis & Roberts, PLLC, a firm approved for such purposes and funded by Wells Fargo.

**FINANCIAL INFORMATION** The following information is available to creditors, equity interest holders, and other parties in interest:

*Monthly Reports.*

A monthly report has been and shall continue to be filed with the Court until the Confirmation Date, and thereafter a quarterly consummation status report shall be filed on behalf of the Debtors until the filing of the Final Report. The Debtor shall file such reports by the end of the month next following the report period, and at the same time shall serve a copy thereon upon the Bankruptcy Administrator and any other party in interest making a written request.

*Financial Information on Record.*

At or shortly after the Petition Date, the Debtor filed Schedules of Assets and Liabilities and Statements of Financial Affairs. The monthly reports, the Schedules of Assets and Liabilities, and the Statements of Financial Affairs may be inspected by interested parties in order to obtain a broader financial picture of the Debtor and the Debtor's estates. These may be examined on-line through PACER or in the office of the Clerk of Court.

*Liquidation Analysis*

The Plan is in fact a plan of orderly liquidation, pursuant to which and with funding assistance from Wells Fargo, the Construction Litigation will be pursued and the remaining unsold units will be marketed and sold. The Debtor has been unable to sell any units post-petition, which the Debtor attributes to a combination of factors and most notably the depressed real estate market conditions and the uncertainty as to whether the alleged construction and/or design defects have been appropriately remedied. Thus, the Debtor's projections as to future

sales are by their nature very speculative and difficult if not impossible to confirm. However, the Debtor has prepared projections for four years of operations, assuming (i) the Plan is confirmed, (ii) sales begin in July 2011 at a modest rate of absorption and gradually increase thereafter, and (iii) the Construction Litigation results in no net recoveries to the Debtor but no claim is allowed to Weaver Cooke. Using these assumptions, the aggregate net sale proceeds would total approximately $28 million, which may be sufficient to pay all Allowed Claims in full.

In the event the case was converted to Chapter 7, the Court would appoint a Chapter 7 trustee, who would cease all operations and then proceed to liquidate all property of the estate. The Chapter 7 trustee would also retain professionals to represent the trustee, such as attorneys and accountants, and the fees and expenses of the Chapter 7 trustee and the trustee's professionals would be Administrative Expense Claims having priority over any outstanding claims (except secured claims) or other administrative expenses incurred prior to the date of conversion to Chapter 7.

In all likelihood, the Trustee would abandon or not oppose relief from the automatic stay so as to permit foreclosure on the remaining Sale Properties, as the present value of the Sale Properties does not appear to exceed the amount of the secured claim held by Wells Fargo. Also, the Trustee would, at most, only monitor the Construction Litigation, as there are no other funds available to the Estate to fund the costs of pursuing the litigation.

A Liquidation Analysis is attached as **Exhibit 3**, reflecting the Debtor's projections, analysis of the Chapter 7 liquidation result, and the Debtor's conclusion that the Plan offers some potential for recovery while Chapter 7 would result in no payment on any unsecured claims. Consequently, it is the Debtor's opinion that the best interests of all creditors, and especially the interests of creditors holding Unsecured Claims, are served through implementation and effectuation of the Plan.

## TAX CONSEQUENCES OF THE PLAN

The federal income tax consequences of the Plan are complex and subject to significant uncertainties. The Debtor has not requested a ruling from the Internal Revenue Service ("IRS") or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to any interpretation that the IRS may adopt. In addition, this summary does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers. Furthermore, this

discussion assumes that holders of Allowed Claims hold only Claims in a single Class. Holders of Allowed Claims in multiple Classes should consult their own tax advisors as to the effect such ownership may have on the federal income tax consequences described below.

There are certain anticipated U.S. federal income tax consequences of the transactions proposed by the Plan to the Debtor and holders of Allowed Claims that are impaired under the Plan. This summary is provided for informational purposes only and is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury regulations, judicial authorities and current administrative rulings and practice, all as in effect as of the date hereof and all of which are subject to change or differing interpretations, possibly with retroactive effect. It does not address all aspects of federal income taxation that may be relevant to the Debtor or to a particular holder of a Claim in light of its particular facts and circumstances or to certain types of holders of Claims subject to special treatment under the Tax Code.

Creditors holding Allowed Claims (whether Priority, Secured or Unsecured) may receive cash payments as provided in the Plan, and in some instances over a period of time with interest, which interest would be separately reportable as income to such creditors. The timing for recognition of revenues, gains or losses for income tax purposes is dependent upon the particular creditor involved and cannot be addressed by the Debtor due to the multiplicity of factors which may be involved. The amount of the income or gain, and its character as ordinary income or capital gain or loss, as the case may be, will depend upon the nature of the claim of each particular Creditor.

The method of accounting utilized by a Creditor for federal income tax purposes may also affect the tax consequences of a distribution. In general, the amount of gain (or loss) recognized by any such Creditor will be the difference between (i) the Creditor's basis for federal income tax purposes, if any, in the Claim; and (ii) the amount of the distribution received. Whether the distribution will generate ordinary income or capital gain will depend upon whether the distribution is in payment of a Claim or an item which would otherwise generate ordinary income on the one hand or in payment of a Claim which would constitute a return of capital.

**PROVISIONS FOR IMPAIRED CREDITORS NOT ACCEPTING PLAN**

With respect to any Class of creditors impaired by and not accepting this Plan by the requisite majority in number and two-thirds (2/3) in dollar amount of those casting ballots, adequate protection for the realization by them of the value of their claim shall be provided in the

Order confirming the Plan by such method as will, in the opinion of the Bankruptcy Judge and consistent with the circumstances of the case, fairly and equitably provide such protection in accordance with the applicable provisions of the Bankruptcy Code.

With respect to the holders of equity interests of the Debtor, the existing equity interests shall be preserved under the Plan, but no distributions will be made by reason of the equity ownership until all Allowed Claims have been paid or satisfied in accordance with the terms of the Plan.

The Bankruptcy Code provides that the Plan may be confirmed even if it is not accepted by all impaired Classes. In order to be confirmed without the requisite number of acceptances of each impaired Class, the Bankruptcy Court must find that at least one impaired Class has accepted the Plan without regard to the acceptance of insiders, and the Plan does not discriminate unfairly against, and is otherwise fair and equitable to, such impaired Class. To the extent confirmation by "cramdown" is necessary or required, the Debtors by the filing of the Plan request confirmation thereof pursuant to Section 1129(b) without further motion or notice, which request shall be considered (if necessary) at the conclusion of the Confirmation Hearing.

**DISCHARGE AND RELEASE.**

Except for the obligations imposed by this Plan, the distributions and rights that are provided in the Plan shall be in complete satisfaction, discharge and release of all (i) Claims against, liabilities of, liens on, and obligations of the Debtor, or the assets and properties of the Debtor and the Reorganized Debtor, whether known or unknown, and (ii) causes of action, directly or derivatively through the Debtor, based on the same subject matter as any Claim.

All proceedings and court actions seeking to establish or enforce pre-petition liabilities and claims of any nature against property of the estate or priorities received or retained by any creditor with respect to debts and obligations of the Debtor shall be permanently stayed and treated as specifically provided for in this Plan.

**DISPUTED CLAIMS AND OBJECTIONS TO CLAIMS**

The Debtor or any party in interest may file an objection to any claim within ninety (90) days after entry of the Order confirming the Plan. Objections not filed within such time shall be deemed waived unless the period within which to file objections to claims is extended by Order of this Court as provided in the Plan.

The absence of an objection prior to the Confirmation Date, whether as to a scheduled or filed claim, shall not be deemed an acceptance of any Claim nor a waiver of the right to object to any Claim, and the holder of any such Claim shall not be entitled to assert reliance upon any implied acceptance of such Claim when voting to accept or reject the Plan.

*Reserves:*

Any claim, or portion thereof, which is to be paid in cash under the Plan and which is challenged, shall be protected by requiring the Reorganized Debtor to segregate and set aside in an escrow account a reserve based on the Court's estimate of such claim and sufficient to treat said claim in the same fashion as though the objection were denied. The reserve so segregated shall be distributed in accordance with the Plan in the event the objection is overruled or a dispute is resolved in favor of the party asserting the claim. In the event the disputed claim is disallowed, the retained cash so segregated shall be retained by the Reorganized Debtor and available for distribution in accordance with the provisions of this Plan, with the disallowed claimant being excluded from the appropriate Class.

**MATTERS TO CONSIDER BEFORE VOTING ON THE PLAN**

*Who May File a Plan.*

The confirmation of the Plan of Reorganization is the ultimate goal of the Chapter 11 proceeding. Consequently, your decision whether to accept or reject the Plan must be made in the context established by the Bankruptcy Code. In a Chapter 11 case, only the Debtor may file a plan of reorganization within the exclusivity period provided by §1121(b).

*Conditions Precedent to Confirmation.*

There are no conditions precedent to confirmation of Plan, except that the Plan is dependent upon funding to be provided by Wells Fargo, and in order for the Plan to be feasible Wells Fargo must accept the Plan.

*What is Necessary for Court Approval of a Plan.*

Chapter 11 permits the adjustment of secured debt, unsecured debt and equity interests. A Chapter 11 Plan may provide for less than full satisfaction of senior indebtedness and payment of junior indebtedness, and may even provide some return to equity owners absent full satisfaction of indebtedness, so long as no impaired class votes against the Plan (except as provided below).

Even if an impaired class votes against the Plan, implementation of the Plan is still possible so long as (i) the Plan is fair and equitable and (ii) that class is afforded certain treatment defined by the Code, broadly defined as giving a claimant the full value of his claim or interest. Such value is determined by the Court and balanced against the treatment afforded the dissenting class of creditors.

In particular, senior claims must be satisfied in full prior to payment of junior claims or interests, unless the holders of senior claims agree to different treatment. This principle (commonly known as the "absolute priority rule") applies only in cases when a class of unsecured claims or equity interests is impaired and does not accept the proposed Plan. In that event, the absolute priority rule does not apply to all classes of unsecured claims and equity interests, but only to the dissenting class and classes junior to the dissenting class.

In the event a class is unimpaired, it is automatically deemed to have accepted the Plan. If there is no dissenting class, the test for confirmation (i.e., approval) by the Court of a Chapter 11 Plan is whether the Plan is feasible and in the best interests of the creditors and equity interest holders. In simple terms, this test requires that creditors and equity interest holders receive more under the Plan than they would obtain if the Debtor was liquidated and the proceeds distributed in accordance with bankruptcy liquidation priorities. The Court, in considering this factor, need not consider any other alternatives to the Plan but liquidation.

The Debtors submit that, in considering "feasibility" the Court is only required to determine whether the Plan can be accomplished. It is the Debtor's opinion that this entails determining the projected availability of cash for payments required to be made at and after the Effective Date, and any other factor which might make it impossible for the Reorganized Debtor to accomplish that which is proposed in the Plan. In addition, in order to confirm a Plan the Court must find that such Plan was proposed in good faith and that the Plan and the Debtor are in compliance with the applicable provisions of Chapter 11. Finally, similar to the requirement that the Court find the Plan to be feasible, the Court must find that liquidation or further

reorganization is not likely to occur after implementation of the Plan, except to the extent the Plan provides for such liquidation.

The determination by the Court that the Plan is fair, equitable and feasible occurs at the confirmation hearing. The Court's adjudication of these matters does not constitute an expression of the Court's opinion as to whether the Plan is a good one nor does it constitute an opinion by the Court regarding any debt or equity interest or securities issued to creditors under the Plan.

*Alternatives to the Plan.*

Although this Disclosure Statement is intended to provide information to assist in the formation of a judgment as to whether to vote for or against the Plan, and although creditors are not being offered, through that vote, an opportunity to express an opinion concerning alternatives to the Plan, the Debtor believes that the only likely alternative to the Plan is the liquidation of the Debtor through conversion of the case to one under Chapter 7. Any such outcome would result in little if any payments to unsecured creditors.

**The Debtor Has Attempted to Set Forth The Likely Alternatives to The Proposed Plan. The Debtor Must Caution Creditors and Other Parties in Interest That a Vote Must Be For or Against The Plan. The Vote on The Plan Does Not Include a Vote on The Likely Alternatives to The Plan. If You Believe The Alternatives Are Preferable to The Plan And You Wish to Urge Them Upon The Court, You Should Consult Counsel As To The Appropriate Response.**

*Specific Considerations in Voting.*

While the Plan provides for certain payments to creditors, such payments will only be made to the holders of Allowed Claims. Under the Bankruptcy Code, a claim may not be paid until it is "allowed" pursuant to § 502. A filed or scheduled claim will be allowed in the absence of an objection. A claim to which an objection has been filed will be heard by the Court at a regular evidentiary hearing and will be allowed in full or in part or disallowed. While the Debtor will bear the principal responsibility for claim objections, any interested party may file claim objections. Accordingly, payment on all claims may be delayed until all pending objections to such claims are ultimately adjudicated or settled.

For Classes of Claims which do not receive payment in full on the Effective Date, there are certain risks inherent in accepting the Plan, including the absence of absolute certainty of ultimate payment, especially with respect to Claims which are to be paid from future revenues.

The Code also requires disclosure that (i) there are no payments or promises made of the kind specified in Section 1129(a)(4) of the Code which have not previously been disclosed to the Court. Specifically, there are no payments to be made or promised to management or any insiders, except for the compensation payable to current employees.

The materials provided in this Disclosure Statement are intended to assist you in voting on the Plan in an informed fashion. If the Plan is confirmed, you will be bound by its terms; therefore, you are urged to review this material and to make such further inquiries as you may deem appropriate, then cast an informed vote on the Plan. The Debtor solicits your acceptance of the Plan as being in the best interests of creditors in this case.

Respectfully submitted on behalf of the Debtor, this the 30th day of December, 2010.

/s/ John A. Northen

**Counsel for the Debtor**
John A. Northen, NCSB #6789
jan@nbfirm.com
Northen Blue, LLP
Post Office Box 2208
Chapel Hill, NC 27515-2208
Telephone:  919-968-4441

**Exhibits to Disclosure Statement:**

1. Plan Of Reorganization Dated December 30, 2010.

2. Schedule Of Scheduled, Filed, And Estimated Allowed Claims, By Class.

3. Liquidation Analysis.

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## WILSON DIVISION

| | |
|---|---|
| **IN THE MATTER OF:**<br><br>**New Bern Riverfront Development, LLC**<br><br>**Debtor** | **Case No. 09-10340-8-JRL**<br>**Chapter 11** |
| **Plan Of Reorganization Dated December 30, 2010** | |

Now comes New Bern Riverfront Development, LLC (the "Debtor"), pursuant to 11 U.S.C. Section 1129 and Rule 3016 of the Federal Rules of Bankruptcy Procedure, and respectfully propose the following Plan of Reorganization Dated June 30, 2010 (the "Plan").

1. **INTRODUCTION.** On November 30, 2009 (the "Petition Date"), the Debtor filed a voluntary petition seeking relief under Chapter 11 of the Bankruptcy Code and an Order for relief was entered. The Debtor continues in possession of its assets as a debtor-in-possession. Pursuant to various orders entered by the Court in response to the Debtor's motions and after notice and hearing, the Debtor (i) obtained authority for use of cash collateral and post-petition financing, (ii) assumed, rejected, or extended the time to assume or reject executory contracts and leases, and (iii) otherwise complied with all requirements for operation and filing of necessary reports with the Court as mandated by the Bankruptcy Code, the Bankruptcy Rules, and Local Rules of the Court.

 1.1. Reference is made to the Disclosure Statement submitted for the Plan and filed on the same date herewith (the "Disclosure Statement") for a brief discussion of the Debtor's history, business, results of operations, historical financial information and properties, the results of post-petition operations, and an analysis of the Plan. All creditors entitled to vote on the Plan should review the Disclosure Statement before voting to accept or reject the Plan.

 1.2. In addition, there may be other agreements and documents that have been filed which are referenced in the Plan and/or the Disclosure Statement and which are available for review. No solicitation materials, other than the Disclosure Statement, have been authorized by the Court for use in soliciting acceptances or rejections of the Plan.

Plan 2010.12.30

**EXHIBIT**

tables

1

2. **DEFINITIONS** For purposes of this Plan and accompanying Disclosure Statement, the following definitions shall apply and, unless otherwise indicated, the singular shall include the plural:

2.1. <u>Allowed Claim or Interest</u>: Any claim against or interest in the Debtor (a) for which a proof of claim or interest was filed on or before the date designated by the Court as the last day on which to file such proofs of claim or interest in this proceeding, or (b) which is listed in the Schedules filed by the Debtor (unless listed as unliquidated, disputed or contingent) and, in either case, to which (i) no objection has been filed within the applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, or Order of this Court, or (ii) an objection has been timely filed and determined by Final Order, and then only to the extent the Order allows such claim or interest.

2.2. <u>Bankruptcy Administrator</u>: The United States Bankruptcy Administrator for the Eastern District of North Carolina.

2.3. <u>Bankruptcy Causes of Action</u>: Any claim or cause of action which may be asserted by a trustee or a debtor-in-possession under Sections 541, 542, 543, 544, 546, 547, 548, 549, 550, or 553 of the Bankruptcy Code.

2.4. <u>Bankruptcy Code</u>: Provisions of Title 11, United States Code, as amended from time to time and applicable to this case.

2.5. <u>Bankruptcy Rules</u>: The Federal Rules of Bankruptcy Procedure, as amended from time to time and applicable to this case.

2.6. <u>Claim</u>: Any right to payment, or any right to an equitable remedy for breach or performance if such breach gives rise to a right to payment, whether or not such right is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.

2.7. <u>Claims Bar Date</u>: The date by which a proof of claim must be filed with the Court, which shall be, as applicable, (i) April 11, 2010 with respect to all creditors except a governmental unit, (ii) May 29, 2010 with respect to a governmental unit, and (iii) with respect to claims arising from the rejection of any lease or executory contract, sixty (60) days after the Confirmation Date, or such other (whether earlier or later) deadline as may be set by the Court generally or with respect to any specific lease or contract rejected.

2.8.    Class: A group of Claims or Equity Interests which are substantially similar to each other, as classified under the Plan.

2.9.    Collateral: Property of the Debtors which has been duly and properly pledged to a creditor to secure indebtedness, and which pledge (of whatever nature) has not been avoided or subordinated.

2.10.    Committee: An official committee of unsecured creditors, if duly formed and appointed.

2.11.    Confirmation Date: The date on which the clerk enters on the Court's docket the Confirmation Order confirming the Plan.

2.12.    Confirmation Order: The Order of the Court confirming the Plan pursuant to § 1129 of the Bankruptcy Code.

2.13.    Consummation, Final: The consummation of all things contained in or provided for in this Plan, and the entry of a Final Decree finally dismissing this reorganization case.

2.14.    Consummation, Substantial: The date on which the Debtors have substantially completed all requirements of this Plan, as determined in accordance with § 1101(2) of the Bankruptcy Code or an Order of Substantial Consummation entered by this Court.

2.15.    Court: The United States Bankruptcy Court for the Eastern District of North Carolina, and any appellate court that exercises jurisdiction over this case.

2.16.    Debtor: New Bern Riverfront Development, LLC.

2.17.    Debtor, Reorganized: The Debtor, after Substantial Consummation has occurred.

2.18.    Disputed Claim: Any Claim which is not an Allowed Claim and with respect to which (i) an objection has been interposed and has not been resolved by agreement or Final Order, (ii) the Debtor has scheduled as disputed, contingent or unliquidated, or (iii) the claim is set forth in an improper proof of claim or a proof of claim untimely filed.

2.19.    Distribution Date: Any date on which distributions are to be made to creditors pursuant to terms and provisions of this Plan or upon approval of this Court.

2.20.    Effective Date: The first day of the month next following the Confirmation Date, unless the Confirmation Order has been stayed.

2.21.    Equity Interest: Any ownership interest (common or preferred stock, options or warrants) in the Debtor.

**2.22.** <u>Estate</u>: The property belonging to the Debtor on the date this case was commenced and as defined by Section 541 of the Bankruptcy Code and other applicable law.

**2.23.** <u>Final Decree</u>: The final decree entered by the Court pursuant to Bankruptcy Rule 3022.

**2.24.** <u>Final Order</u>: An order (i) as to which the time to appeal or seek review or rehearing has expired and as to which no motion or petition for review or rehearing is pending, or (ii) if an appeal, motion or petition for review or rehearing is pending, the operation or effect of which order has not been stayed, reversed, or amended.

**2.25.** <u>Final Report</u>: A report to be filed by the Debtor with the Court upon and after completion of all acts required to achieve Final Consummation of the Plan, which report shall include, but not be limited to, all information necessary to meet the reporting requirements of the Court, the Bankruptcy Administrator, and the Plan.

**2.26.** <u>Lien</u>: A deed of trust, mortgage, judgment lien, materialman's lien, statutory lien, security interest, pledge, charging order, or other encumbrance on the Debtor's property, effective under applicable laws as of the Petition Date or thereafter as authorized by Order of the Court.

**2.27.** <u>Net Sale Proceeds</u>: The amount remaining from the gross sale proceeds arising from the sale of any of the Debtor's real property, after payment or provision for the purchaser's deposit; seller concessions as provided in the contract of sale; seller closing costs; where applicable, broker's commissions; and where applicable, funds advanced by the Debtor from working capital to complete, repair or finish the real property or provide furnishings thereto.

**2.28.** <u>Notice and Hearing</u>: Notice and hearing as defined by Section 102 of the Bankruptcy Code.

**2.29.** <u>Petition Date</u>: November 30, 2009.

**2.30.** <u>Plan</u>: This plan of reorganization and any modification thereof as approved by the Court.

**2.31.** <u>Priority Claim</u>: An allowed claim that is unsecured and is entitled to priority under Section 507 or Section 364 of the Bankruptcy Code, excluding Priority Tax Claims.

**2.32.**    Priority Creditor: A creditor with an Unsecured Priority Claim.

**2.33.**    Priority Tax Claim: An allowed claim for federal, state or local taxes that is unsecured and is entitled to priority under Section 507 or Section 364 of the Bankruptcy Code.

**2.34.**    Priority Tax Creditor: A creditor with an Unsecured Priority Tax Claim.

**2.35.**    Pro Rata: The proportion that each allowed claim in a particular class of creditors or interests bears to the aggregate of all allowed claims or interests in that Class on the relevant date.

**2.36.**    Sale Properties: The condominium units in SkySail Condominium located on Middle Street, New Bern, NC, and vested in the Debtor as of the Effective Date.

**2.37.**    Secured Claim: An allowed claim that is secured by a Lien which has not been or is not subsequently avoided, but only to the extent of the value of the Collateral subject to such Lien as determined under Section 506 of the Bankruptcy Code.

**2.38.**    Secured Creditor: A creditor with a Secured Claim.

**2.39.**    Unsecured Claim: An allowed claim that is unsecured and is not entitled to be treated as a Priority Claim, a State Escrow Claim or a State Penalty Claim.

**2.40.**    Unsecured Creditor: A creditor with an Unsecured Claim.

**3.**    **PROVISION FOR PAYMENT OF ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS**

**3.1.**    Administrative Claims shall be allowed upon due request or application and in such amounts as may be determined by the Court after notice and hearing.

**3.1.1.**    Attorneys, accountants and other professionals retained by or on behalf of the Debtor or by an official committee shall be compensated for services rendered in such capacity and reasonably necessary to the administration of this estate, upon an hourly basis and at their customary hourly rates or in such amounts as may be determined by the Court, but not to exceed reasonable compensation for such services.

**3.1.2.**    The holders of Allowed Administrative Claims shall be paid in cash on the Effective Date or within thirty days after the same can be determined and, if necessary, allowed by the Court.

3.2.    The holders of Allowed Priority Tax Claims shall be paid in cash, with interest at the applicable statutory rate, and either (i) in quarterly or more frequent installments over a period not exceeding five (5) years from and after the Petition Date, or (ii) with respect to ad valorem property taxes, on or before the date such taxes are due and payable without penalty.

4.    **DESIGNATION OF CLASSES OF CLAIMS AND EQUITY INTERESTS**    For purposes of the Plan, Claims and Equity Interests are classified as follows:

4.1.    **Class 1** shall consist of the Secured Claim of Wells Fargo Bank, N.A., successor by merger to Wachovia Bank, N.A. ("Wells Fargo") of approximately $21 million (the "Wells Fargo Indebtedness") secured by a first lien upon the Sale Properties, as evidenced by a proof of claim filed by Wells Fargo (Claim No. 32) to which the relevant loan documentation is attached (the "Wells Fargo Loan Documents").

4.2.    **Class 2** shall consist of the Secured Claim of Weaver Cooke Construction, LLC of approximately $2.4 million (the "Weaver Cooke Claim") arising from the contract for design and/or construction of the Sale Properties, and secured by a second lien on the Sale Properties, as evidenced by a proof of claim filed by Weaver Cooke (Claim No. 29).

4.3.    **Class 3** shall consist of the Allowed Unsecured Claims, including the unsecured portion of any claims listed herein as secured but which are determined to be unsecured by order of the Court or applicable law after (a) valuation or liquidation of property serving as Collateral to said claimant, or (b) avoidance of any Lien securing such claim.

4.4.    **Class 4** shall consist of Claims arising from an alleged breach by the Debtor of a prepetition contract to sell one or more Sale Properties.

4.5.    **Class 5** shall consist of Equity Interests.

5.    **TREATMENT OF CLASSES IMPAIRED UNDER THE PLAN**    Claims and Interests shall receive the following treatment under the Plan; *provided however*, the Reorganized Debtor may prepay any Allowed Claim, in part or in full, at any time and without penalty:

5.1.    **Class 1: Secured Claim of Wells Fargo.** The Secured Claim of Wells Fargo shall be treated as follows:

**5.1.1.** From and after the Effective Date, the outstanding principal amount of the Wells Fargo Indebtedness shall bear interest at the contract, non-default rate as specified in the Wells Fargo Loan Documents. Principal, interest accrued and outstanding as of the Effective Date, interest accruing after the Effective Date, and the reasonable attorneys' fees and costs incurred by Wells Fargo, in an amount agreed to by the parties or as may be determined by the Court pursuant to Section 506, shall be paid as set forth below.

**5.1.2.** Wells Fargo will fund all approved costs of administration, including, without limitation, allowed attorneys' fees and costs, taxes, condo association operating deficits, and maintenance costs, with all costs being treated as post-petition financing and a protective advance under the Note.

**5.1.3.** Wells Fargo will fund all post-confirmation carrying costs, including, without limitation, allowed attorneys' fees and costs, taxes, condo association operating deficits, and maintenance costs, with all costs being a protective advance under the Note.

**5.1.4.** Wells Fargo shall pay the Debtor's litigation costs, with all costs being a protective advance under the Note, and shall have the sole authority to retain counsel to prosecute and defend the litigation. Any proceeds from the litigation (by settlement or otherwise), shall be paid to Wells Fargo up to and until the Note is paid in full.

**5.1.5.** For a period of two years following the Effective Date, upon the sale of each unit (excluding sales to Lender pursuant to credit-bid at foreclosure), ninety percent (90%) of the net proceeds shall be paid to Wells Fargo. Wells Fargo shall be permitted to either (a) apply the funds to the Note, in its sole discretion or (b) use the funds to pay monthly expenses as set forth above.

**5.1.6.** Ten percent (10%) of the net proceeds of all sales (excluding sales to Lender pursuant to credit-bid at foreclosure) shall be set aside in an interest-bearing account, subject to Wells Fargo's first-priority lien. Once Wells Fargo is paid in full and reimbursed for all protective advances, unless otherwise agreed by Lender or as otherwise ordered by the Court, these funds together with any Net Sale Proceeds from unsold units will be used to pay other creditors.

5.1.7.  Upon the earlier of two (2) years from the Effective Date or completion of the pending litigation, unless otherwise extended by Wells Fargo in its sole discretion, and to the extent the Note is not paid in full, Wells Fargo shall be permitted to foreclose on its Deed of Trust.

5.2.  **Class 2: Secured Claim of Weaver Cooke.** The Secured Claim of Weaver Cooke shall be treated as follows:

5.2.1.  The Weaver Cooke Claim is disputed and shall be allowed, if at all, in such amount as shall be determined (i) by Final Order of the Court, or (ii) as agreed by the parties subject to approval by the Court after notice and hearing.

5.2.2.  From and after the date of an Order allowing such claim, the outstanding principal amount of such claim shall bear interest at the federal judgment rate in effect as of the date of such Order.

5.2.3.  Until such time as the Weaver Cooke Claim is determined by Final Order, no payments shall be made on such claim. Weaver Cooke's claim of lien upon the Sale Properties shall be transferred to the Net Sale Proceeds and shall be cancelled of record within thirty (30) days after the Effective Date.

5.2.4.  Commencing with closings which occur after the Effective Date, ten percent (10%) of the Net Sale Proceeds shall be held in escrow to secure payment of such claim to the extent allowed but only after payment of the senior lien of Wells Fargo.

5.3.  **Class 3:  Unsecured Claims:**  Holders of Allowed Unsecured Claims will be paid from any Net Sale Proceeds remaining after payment in full of (i) the secured claim of Wells Fargo and (ii) the secured claim of Weaver Cooke.

5.4.  **Class 4: Purchase Contract Claims:**  Persons who are (i) parties to prepetition contracts to purchase one or more Sale Properties ("Contract Purchasers"), and (ii) asserting claims based upon an alleged breach by the Debtor of such contracts,  may elect one of the following treatment options:

5.4.1.  The contract will be assumed by the Debtor with the express consent of the Contract Purchaser, in which event the parties shall proceed with closing in accordance with the contract terms within thirty (30) days after the Effective Date.

5.4.2.  The contract will be rejected by the Debtor with the express consent of the Contract Purchaser, in which event the Debtor shall retain the earnest money deposit

and each party shall release the other from any and all claims, including but not limited to a waiver and release of any claim arising from the rejection of the contract.

   5.4.3.   In the absence of an election by the Contract Purchaser of either Option A or Option B, the contract shall remain in place subject to assumption or rejection by the Debtor pursuant to Section 365 of the Bankruptcy Code and each party shall retain all legal and equitable rights and remedies subject to the provisions of the Bankruptcy Code and the Plan. In the event the contract is rejected and the Contract Purchaser has a claim allowed by Final Order, such claim shall be treated as a Class 3 Allowed Unsecured Claim.

**5.5.**    **Class 5: Equity Interests**:  The Equity Interests shall be unimpaired; provided however, the Debtor's operating agreement shall be amended to provide that the issuance of non-voting equity securities is prohibited.

**6.**    **MEANS FOR EXECUTION OF THE PLAN**  The Debtor shall execute and consummate the Plan as follows:

**6.1.**    **Vesting of Assets:**  All tangible and intangible assets of the Debtor shall vest in the Reorganized Debtor as of the Effective Date.

**6.2.**    **Funding on and after the Effective Date**: Wells Fargo will advance funds necessary to pay costs of administration, and to pay for operations and litigation costs after the Effective Date, all as a protective advance under the Note. The Net Sale Proceeds derived from the Sale Properties, together with any recoveries from the pending civil action by the Debtor against Weaver Cooke and other parties (the "Construction Litigation"), will be the sole means to repay Wells Fargo for the protective advances and to fund the payment of Allowed Claims under the Plan.

**6.3.**    **Consultant:**  The Reorganized Debtor will retain a consultant, approved by Wells Fargo (the "Consultant"), to manage post-confirmation operations and to sell and convey the Sale Properties.

   6.3.1.   The Consultant shall work with the Debtor and Wells Fargo in managing post-confirmation operations. The Debtor and its managers shall fully cooperate with Wells Fargo and the Consultant in the management of the property and the litigation

and be available to Wells Fargo and the Consultant as may reasonably be requested by Wells Fargo and/or the Consultant.

**6.3.2.**   The Consultant shall have the ability and authority to sell units, and shall have sole control over the asking price and sale price for each unit. The Debtor and its managers shall execute any documents reasonably necessary for the Consultant to manage the property and the litigation and to sell and convey the Sale Properties, including, without limitation, deeds and other closing documents necessary to convey any units.

**6.3.3.**   The Consultant will invoice Wells Fargo for its services and Wells Fargo will pay all invoices, with such amounts being a protective advance under the Note.

**6.4.**      **Post-Confirmation Litigation:**

**6.4.1.**   The Construction Litigation shall be pursued to its conclusion, by final judgment or settlement, in the Court. Wells Fargo shall oversee and manage the pending litigation involving the Debtor.  Wells Fargo shall pay the Debtor's litigation costs, with all costs being a protective advance under the Note, and shall have the sole authority to retain counsel to prosecute and defend the litigation.

**6.4.2.**   The Debtor shall retain the right to bring any other cause of action. All Bankruptcy Causes of Action shall be brought in the Court and shall be governed by Bankruptcy Rules 7001 et seq.  Any compromise or other settlement of a controversy by the Debtors or the Liquidating Trustee shall be approved in accordance with the Bankruptcy Rules.

**6.5.**      **Executory Contracts and Leases:**

**6.5.1.**   All executory contracts or leases which are existing on the Effective Date, which have not been rejected or which are subject to a pending motion to reject, are and shall be deemed assumed by the Reorganized Debtor as of the Effective Date and any defaults shall be promptly cured as and to the extent required by Section 365 of the Bankruptcy Code.

**6.5.2.**   In the event the Debtor has not paid the amount necessary to cure any such default within thirty (30) days after the Effective Date, or in the event the parties to any such contract or lease are in disagreement as to the amount to be paid, either party

may request and shall be provided a hearing to resolve such dispute on an expedited basis.

**6.5.3.** A Claim for damages arising from the rejection of a executory lease or contract shall be forever barred and shall not be enforceable against the Estate and no holder of any such Claim shall participate in any distribution under the Plan with respect to that Claim unless a Proof of Claim is served on the Debtor and filed with the Court within sixty (60) days from the Confirmation Date, or such other (whether earlier or later) deadline as may be set by the Court generally or with respect to any lease or contract rejected, and said Proof of Claim is determined to be an Allowed Claim, either because no timely objection is filed or because the Court allows the Claim after a timely filed objection.

## 7.    PROVISIONS FOR IMPAIRED CREDITORS NOT ACCEPTING PLAN

**7.1.**    With respect to any Class of Claims impaired by and not accepting this Plan by the requisite majority in number and two-thirds (2/3) in dollar amount of those casting ballots, adequate protection for the realization by them of the value of their claim shall be provided in the Order confirming the Plan by such method as will, in the opinion of the Bankruptcy Judge and consistent with the circumstances of the case, fairly and equitably provide such protection in accordance with the applicable provisions of the Bankruptcy Code.

**7.2.**    To the extent Plan confirmation by "cramdown" is necessary or required, the Debtor by the filing of the Plan requests confirmation thereof pursuant to Section 1129(b) without further motion or notice, which request shall be considered at the Confirmation Hearing.

## 8.    DISCHARGE AND RELEASE.    Except for the liens preserved and obligations imposed by the Plan:

**8.1.**    The distributions and rights that are provided in the Plan shall be in complete satisfaction, discharge and release of all (i) claims against, liabilities of, liens on, and obligations of the Debtor, or the assets and properties of the Debtor and the Reorganized Debtor, whether known or unknown, and (ii) causes of action, directly or derivatively through the Debtor, based on the same subject matter as any Claim.

8.2.    All proceedings and court actions seeking to establish or enforce pre-petition liabilities and claims of any nature against property of the estate or priorities received or retained by any creditor with respect to debts and obligations of the Debtor shall be permanently stayed and treated as specifically provided for in this Plan.

9.    **PROVISIONS FOR RETENTION OF JURISDICTION AND PROSECUTION AND DEFENSE OF CLAIMS AND CAUSES OF ACTION** The Court shall retain and may exercise its jurisdiction for determination in this proceeding of any objections to claims not disposed of prior to the entry of the Order of confirmation of the Plan, the final determination of any causes of action (including Bankruptcy Causes of Action) belonging to the Debtor, and any other matters which might affect the Debtor, the Reorganized Debtor, or the consummation of this Plan.

9.1.    **General Jurisdiction**: Until the entry of a Final Decree, the Court shall retain jurisdiction to ensure that the purpose and intent of the Plan is carried out; to hear and determine all claims against the Debtor; to hear, determine, and enforce all causes of action (including all Bankruptcy Causes of Action) arising in, arising under, or related to this case and which may exist on behalf of the Debtor; and, to confirm after notice and hearing (except as otherwise provided herein) any proposed compromise of any cause of action (including all Bankruptcy Causes of Action). Nothing contained herein shall prevent the Debtor from taking such action as may be necessary in the enforcement of any cause of action which may exist on its behalf, and nothing contained herein shall prevent any creditor from enforcing any claim it may have against third parties who may be liable as a result of the Debtor's obligations to such creditor.

9.2.    **Causes of Action**: Notwithstanding the vesting of assets in the Reorganized Debtor upon confirmation and consummation of the Plan, the Debtor shall retain the right and standing to assert and shall have the sole and exclusive right to commence, pursue, settle, compromise, abandon, waive, or release any claim or cause of action which may exist on behalf of the Debtor (including Bankruptcy Causes of Action) which accrued and were asserted or capable of assertion by the Debtor as a debtor-in-possession as of the Petition Date.

**9.3.**      **<u>Specific Retention of Powers</u>**: In addition to the general provisions set forth above, the Court shall retain sole jurisdiction of this case pursuant to the provisions of Chapter 11 of the Bankruptcy Code for the following purposes, *inter alia*:

**9.3.1.** To classify, allow or disallow Claims and Interests, to direct distributions of funds under the Plan, and to hear and determine any controversies pertaining thereto.

**9.3.2.** To hear and determine any and all applications, adversary proceedings or other matters arising out of or related to the Plan.

**9.3.3.** To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked or vacated.

**9.3.4.** To liquidate or estimate the amount of any claim, or to determine the manner and time for such liquidation or estimation in connection with any contingent or unliquidated claim.

**9.3.5.** To adjudicate all disputes with respect to claims or any lien on any property of the Debtor or proceeds thereof.

**9.3.6.** To adjudicate all claims or controversies arising during the pendency of this case.

**9.3.7.** To recover all assets and properties of the Debtor, wherever located, including recoveries on all claims and causes of action brought by the Debtor prior or subsequent to the Effective Date or capable of being brought by the Debtor prior or subsequent to the Effective Date which are not released, settled or otherwise compromised by the terms of this Plan.

**9.3.8.** To hear and determine matters covering federal, state, and local taxes pursuant to Sections 346, 1146, 505 and 525 of the Bankruptcy Code.

**9.3.9.** To allow fees and reimbursement of the expenses of professional persons employed during this case or any other person or entity applying for compensation.

**9.3.10.** To construe or enforce the Plan so as to effectuate payments or to compel performance by any person reasonably necessary to achieve Final Consummation in accordance with the provisions hereof.

**9.3.11.** To make and enforce such orders as are necessary or appropriate to carry out the provisions of the Plan.

**9.3.12.** To enter such orders as may be necessary and proper for the orderly administration of the Debtor's affairs.

**9.3.13.** To protect and preserve the leases and other executory agreements between various third parties and the Debtor or its affiliates or subsidiaries, and to assure that all terms of those agreements are honored to the extent and in the event that such agreements are assumed under this Plan.

**9.3.14.** To decide such other matters and for such other purposes as may be provided for in the Confirmation Order.

**10.**   **PROVISIONS FOR AMENDMENT OF THE PLAN** The Plan may be modified as follows:

**10.1.**   **Non-material Amendment**: This Plan may be altered or modified by the Debtor after its submission for acceptance and before or after its confirmation, without notice and hearing, if the alteration or modification does not adversely change the treatment of the claim of any creditor as provided in Section 1127 of the Bankruptcy Code and in Bankruptcy Rule 3019.

**10.2.**   **Material Amendment**: This Plan may be altered or modified by the Debtor after submission for acceptance and before or after confirmation in a manner which adversely affects the interests of creditors, only (i) after notice and hearing before the Court for the confirmation of such alteration or modification, as provided in Section 1127 of the Bankruptcy Code, or (ii) with the written consent of the creditors who are adversely affected.

**11.**   **OBJECTIONS TO CLAIMS, RESERVES AND DISTRIBUTIONS**

**11.1.**   **Claims**: The Debtor or any party in interest may file an objection to any claim within ninety (90) days after entry of the Order confirming the Plan. Objections not filed within such time shall be deemed waived unless the period within which to file objections to claims is extended by Order of this Court in response to one or more motions for such extension filed prior to the expiration of the then existing period for such objections to be filed. The absence of an objection prior to the Confirmation Date, whether as to a scheduled or filed claim, shall not be deemed an acceptance of any Claim nor a waiver of the right to object to any Claim, and the holder of any such Claim shall not be entitled to assert reliance upon any implied acceptance of such Claim when voting to accept or reject the Plan.

**11.2.**    **Reserves**: Any claim, or portion thereof, which is to be paid in cash under the Plan and which is challenged, shall be protected by requiring the Reorganized Debtor to segregate and set aside in an escrow account a reserve based on the Court's estimate of such claim and sufficient to treat said claim in the same fashion as though the objection were denied. The reserve so segregated shall be distributed in accordance with the Plan in the event the objection is overruled or a dispute is resolved in favor of the party asserting the claim. In the event the disputed claim is disallowed, the retained cash so segregated shall be retained by the Reorganized Debtor and available for distribution in accordance with the provisions of this Plan, with the disallowed claimant being excluded from the appropriate Class.

**11.3.**    **Distributions**: Distributions to holders of Allowed Claims shall be made at the address of each such holder as set forth on the Schedules filed with the Bankruptcy Court unless superseded by the address as set forth on the proof of claim filed by such holders or other subsequent writing notifying the Debtor of a change of address.

**11.3.1.** No interim or final distribution shall be made in an amount less than $5.00, and any such distributions shall instead be paid over to the U.S. Treasury as provided in Section 347 and Bankruptcy Rule 3010 for small dividends as in a Chapter 7 proceeding.

**11.3.2.** If any holder's distribution is returned as undeliverable, no further distributions to such holder shall be made unless and until the Debtor has been notified of such holder's then current address, at which time all missed distributions shall be made to such holder, without interest from the date of the first attempted distribution.

**11.3.3.** All unclaimed distributions which exist as of the date of the final distribution to holders of Allowed Claims may be retained by the Debtor or paid over to the U.S. Treasury as provided in Section 347 and Bankruptcy Rule 3011 for unclaimed distributions as in a Chapter 7 proceeding.

**11.3.4.** Checks issued by the Debtors in respect of Allowed Claims shall be null and void if not negotiated within sixty (60) days after the date of issuance thereof. Requests for re-issuance of any check shall be made to the Debtor by the holder of the Allowed Claim with respect to which such check originally was issued.

11.3.5. The Debtor may, in accordance with Section 553 of the Bankruptcy Code and applicable non-bankruptcy law, set off against any Allowed Claim the distributions to be made pursuant to this Plan on account of such Claim (before any distribution is made on account of such Claim), the claims, rights and causes of action of any nature that the Debtor may possess against the holder of such Allowed Claim; provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor or the Estate of any such claims, rights and causes of action that they may possess against such holder; and provided further, that any claims of the Debtor arising before the Petition Date shall first be set off against Claims against the Debtor arising before the Petition Date.

## 12. GENERAL PROVISIONS

12.1. **Exculpation.** Neither the Debtor, the Reorganized Debtor, nor any of their respective members, managers, officers, directors, employees, advisors, attorneys, accountants, consultants or agents shall have or incur any liability for or to any holder of a Claim or Interest for any act or omission in connection with, or arising out of, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan except for willful misconduct or gross negligence and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

12.2. **Binding Effect.** The Plan shall be binding upon and inure to the benefit of the Debtor, the Reorganized Debtor, holders of Claims, holders of Equity Interests, and their respective successors and assigns.

12.3. **Injunctions or Stays.** Unless otherwise provided in the Plan or in the Order confirming the Plan, all injunctions or stays provided for Chapter 11 cases under Section 105 or 362 of the Bankruptcy Code or otherwise in existence on the date this case is confirmed shall remain in full force and effect until the entry of a Final Decree dismissing the case.

12.4. **Notices.** Any notice required to be provided to parties in interest under the Bankruptcy Code or Rules or under the Plan shall be in writing and served by (a) regular mail, postage prepaid, (b) hand delivery, or (c) overnight delivery service, addressed to

the appropriate parties and with copies of any such notice to be sent to the Bankruptcy Administrator and to counsel for the Debtor.

12.5.    **Governing Law**.  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules), or, as to corporate matters, the laws of the jurisdiction in which the Debtor is incorporated, the laws of the State of North Carolina shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan.

Respectfully submitted on behalf of the Debtor, this the 30th day of December, 2010.

/s/ John A. Northen

**Counsel for the Debtor**
John A. Northen, NCSB #6789
jan@nbfirm.com
Northen Blue, LLP
Post Office Box 2208
Chapel Hill, NC 27515-2208
Telephone:  919-968-4441

DS Exh 2 Sched of Claims

| Class | Creditor | Comment | Scheduled | Filed | Estimated |
|---|---|---|---|---|---|
| Admin | Northen Blue | Attorney | | | 30,000 |
| Admin | Ward & Smith | Attorney | | | 85,212 |
| | **Subtotal Admin** | | | | **115,212** |
| | | | | | |
| Priority | City of New Bern | property taxes-2009 | 141,951 | 140,763 | 140,763 |
| Priority | Craven County | property taxes-2009 | 129,325 | 128,239 | 128,239 |
| | **Subtotal Priority/Secured** | | | | **269,002** |
| | | | | | |
| 1 | Wells Fargo | 1st lien on units & litigation | 21,015,209 | 21,100,928 | 21,100,928 |
| | | | | | |
| 2 | Weaver Cooke | 2nd lien on units, disputed | 2,344,072 | 2,390,237 | 0 |
| | | | | | |
| 3 | Cebridge Acquisitions | | 7,000 | | 7,000 |
| 3 | City of New Bern | sidewalk assessments | 67,700 | | 67,700 |
| 3 | City of New Bern | tap fees | 145,580 | | 145,580 |
| 3 | City of New Bern | utilities | 14,000 | | 14,000 |
| 3 | Hatchett Hospitality | | 102,446 | | 102,446 |
| 3 | Howard Perry & Walston | | 1,200 | 1,200 | 1,200 |
| 3 | JDA Architects | | 5,000 | | 5,000 |
| 3 | Marina Business Ventures | related party | 327,420 | | 327,420 |
| 3 | McKim & Creed | | 13,116 | | 13,116 |
| 3 | National Erectors Rebar | subcontractor | | 46,012 | 0 |
| 3 | Philadelphia Insurance | | 15,814 | | 15,814 |
| 3 | RyPark Advertising | | 4,765 | 11,074 | 11,074 |
| 3 | Siemens Building Technologies | | 22,591 | | 22,591 |
| 3 | Soleil Group | related party | 71,480 | | 71,480 |
| 3 | T & S Property Management | | 27,835 | | 27,835 |
| 3 | The Insurance Center | | 10,444 | | 10,444 |
| 3 | Trent-Neuse Hotel | related party | 748,542 | | 748,542 |
| 3 | URS Corp. | | 70,639 | | 70,639 |
| 3 | Ward & Smith | | 330,613 | | 330,613 |
| 3 | Welcome Real Estate Co. | related party | 60,037 | | 60,037 |
| | **Sub-total Class 3** | | 2,046,222 | | **2,052,531** |
| | | | | | |
| 4 | Boyce, Christopher | contract, disputed | | 44,196 | 0 |
| 4 | Burgess, Daryl et al | contract, disputed | | 44,630 | 0 |
| 4 | Buvid, Ann & Spratt, Martin | contract, disputed | | 32,248 | 0 |
| 4 | Campbell, Michael & Catherine | contract, disputed | | 49,284 | 0 |
| 4 | Cherry, Jay & Ann | contract, disputed | | 19,777 | 0 |
| 4 | Crane, Janet E., Trustee | contract, disputed | | 53,473 | 0 |
| 4 | Curd, Thomas & Susan | contract, disputed | | 35,390 | 0 |
| 4 | Drezen, Stephen | contract, disputed | | 46,375 | 0 |
| 4 | Duckett, Dwayne & Claire | contract, disputed | | 68,682 | 0 |
| 4 | Fiorito, Rosemarie | contract, disputed | | 40,004 | 0 |
| 4 | Halpin, Mark & Ninette | contract, disputed | | 40,093 | 0 |
| 4 | Johnson, Erline & Graham, Trustees | contract, disputed | | 86,455 | 0 |
| 4 | Kramer, Jonathan & Laurie | contract, disputed | | 59,425 | 0 |
| 4 | Letts, Douglas & Pamela | contract, disputed | | 33,883 | 0 |
| 4 | Miller, Gregory & Paula | contract, disputed | | 26,890 | 0 |
| 4 | Mullan, Susan | contract, disputed | | 30,690 | 0 |
| 4 | Naugler, David & Elaine | contract, disputed | | 53,957 | 0 |
| 4 | Razzano, John & Patricia | contract, disputed | | 46,593 | 0 |
| 4 | Romero, Julian | contract, disputed | | 34,770 | 0 |
| 4 | Sanders, Steven | contract, disputed | | 26,315 | 0 |
| 4 | Shults, Theodore & Katharine | contract, disputed | | 76,901 | 0 |
| 4 | Spratt, Justin & Martin | contract, disputed | | 26,652 | 0 |
| 4 | Sturman Family Trust | contract, disputed | | 51,757 | 0 |

**EXHIBIT**

tabbies®

2

DS Exh 2 Sched of Claims

| Class | Creditor | Comment | Scheduled | Filed | Estimated |
|---|---|---|---|---|---|
| 4 | Taylor, Jeffrey & Ellis, Melissa | contract, disputed | | 28,925 | 0 |
| 4 | Toomey, Melvin | contract, disputed | | 23,390 | 0 |
| 4 | Toomey, Melvin | contract, disputed | | 23,390 | 0 |
| | **Sub-total Class 4** | | 0 | 1,104,145 | **0** |

DS Exh 3 Liq Analysis

**NEW BERN RIVERFRONT DEVELOPMENT, LLC**
TAB 1 OF 4 (cashflow)

## PROJECTION OF SALES AND CASHFLOWS - YEAR ONE (1)

| | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | YEAR 1 | TO DATE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Units Sold | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 12 | |
| Average Sales Price | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | | |
| Gross Sales | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 4,523,089 | |
| Est. Closing Costs | 6.34% | 6.34% | 6.34% | 6.34% | 6.34% | 6.34% | 6.34% | 6.34% | 6.34% | 6.34% | 6.34% | 6.34% | | |
| Net Sales Proceeds | $ 353,015 | $ 353,015 | $ 353,015 | $ 353,015 | $ 353,015 | $ 353,015 | $ 353,015 | $ 353,015 | $ 353,015 | $ 353,015 | $ 353,015 | $ 353,015 | $ 4,236,175 | |

| | Units | | Est Tax Bill | | Per Unit | |
|---|---|---|---|---|---|---|
| Estimated Property Taxes | 79 | | $ 400,000 | | $ 5,063 | |
| | | Percent | | | Per Unit | |
| Commissions | | 2.50% | | | $ 9,423 | |
| | | Percent | | | Per Unit | |
| Other | | 2.50% | | | $ 9,423 | |
| | | | | Percent | | |
| TOTAL ESTIMATED CLOSING COSTS PER UNIT | | | | 6.34% | $ 23,909 | |

Year 1

**EXHIBIT**

3

tabbies®

DS Exh 3 Liq Analysis

**NEW BERN RIVERFRONT DEVELOPMENT, LLC**
TAB 2 OF 4 (cashflow)

### PROJECTION OF SALES AND CASHFLOWS - YEAR TWO (2)

| | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | YEAR 2 | TO DATE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Units Sold | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 24 | |
| Average Sales Price | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | | |
| Gross Sales | $ 753,848 | $ 753,848 | $ 753,848 | $ 753,848 | $ 753,848 | $ 753,848 | $ 753,848 | $ 753,848 | $ 753,848 | $ 753,848 | $ 753,848 | $ 753,848 | $ 9,046,176 | $ 13,569,265 |
| Est. Closing Costs | 6.31% | 6.31% | 6.31% | 6.31% | 6.31% | 6.31% | 6.31% | 6.31% | 6.31% | 6.31% | 6.31% | 6.31% | | |
| Net Sales Proceeds | $ 706,305 | $ 706,305 | $ 706,305 | $ 706,305 | $ 706,305 | $ 706,305 | $ 706,305 | $ 706,305 | $ 706,305 | $ 706,305 | $ 706,305 | $ 706,305 | $ 8,475,658 | $ 12,711,833 |

| | Units | Est Tax Bill | | Per Unit |
|---|---|---|---|---|
| Estimated Property Taxes | 67 | $ | 330,000 | $ 4,925 |
| | Percent | | | Per Unit |
| Commissions | 2.50% | | | $ 9,423 |
| | Percent | | | Per Unit |
| Others & DIP Provisions(est) | 2.50% | | | $ 9,423 |
| | | | Percent | |
| **TOTAL ESTIMATED CLOSING COSTS** | | | 6.31% | **$ 23,772** |

Year 2

DS Exh 3 Liq Analysis

**NEW BERN RIVERFRONT DEVELOPMENT, LLC**
TAB 3 OF 4 (cashflow)

### PROJECTION OF SALES AND CASHFLOWS - YEAR THREE (3)

| | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | YEAR 3 | TO DATE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Units Sold | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 24 | |
| Average Sales Price | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 9,046,176 | $ 22,615,441 |
| Gross Sales | $ 753,848 | $ 753,848 | $ 753,848 | $ 753,848 | $ 753,848 | $ 753,848 | $ 753,848 | $ 753,848 | $ 753,848 | $ 753,848 | $ 753,848 | $ 753,848 | | |
| Est. Closing Costs | 5.86% | 5.86% | 5.86% | 5.86% | 5.86% | 5.86% | 5.86% | 5.86% | 5.86% | 5.86% | 5.86% | 5.86% | | |
| Net Sales Proceeds | $ 709,692 | $ 709,692 | $ 709,692 | $ 709,692 | $ 709,692 | $ 709,692 | $ 709,692 | $ 709,692 | $ 709,692 | $ 709,692 | $ 709,692 | $ 709,692 | $ 8,516,307 | $ 21,228,140 |

| | Units | | Est Tax Bill | | Per Unit | |
|---|---|---|---|---|---|---|
| Estimated Property Taxes | 43 | | $ 220,000 | | $ 5,116 | |
| | | Percent | | | Per Unit | |
| Commissions | | 2.50% | | | $ 9,423 | |
| | | Percent | | | Per Unit | |
| Others & DIP Provisions(est) | | 2.00% | | | $ 7,538 | |
| | | | | Percent | | |
| | | | | 5.86% | | |
| **TOTAL ESTIMATED CLOSING COSTS PER UNIT** | | | | | **$ 22,078** | |

Year 3

DS Exh 3 Liq Analysis

**NEW BERN RIVERFRONT DEVELOPMENT, LLC**
TAB 4 OF 4 (cashflow)

| PROJECTION OF SALES AND CASHFLOWS – YEAR FOUR(4) | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | YEAR 4 | TO DATE |
| Units Sold | 2 | 2 | 2 | 1 | 1 | 1 | 1 | 1 | 2 | 2 | 2 | 2 | 19 | |
| Average Sales Price | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | | $ 29,776,997 |
| Gross Sales | $ 753,848 | $ 753,848 | $ 753,848 | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 376,924 | $ 753,848 | $ 753,848 | $ 753,848 | $ 753,848 | $ 7,161,556 | $ 29,776,997 |
| Est. Closing Costs | 5.60% | 5.60% | 5.60% | 5.60% | 5.60% | 5.60% | 5.60% | 5.60% | 5.60% | 5.60% | 5.60% | 5.60% | | |
| Net Sales Proceeds | $ 711,599 | $ 711,599 | $ 711,599 | $ 355,799 | $ 355,799 | $ 355,799 | $ 355,799 | $ 355,799 | $ 711,599 | $ 711,599 | $ 711,599 | $ 711,599 | $ 6,760,190 | $ 27,988,330 |

| | Units | Est Tax Bill | Per Unit |
|---|---|---|---|
| Estimated Property Taxes | 19 | $ 97,000 | $ 5,105 |
| | Percent | | Per Unit |
| Commissions | 2.50% | | $ 9,423 |
| | Percent | | Per Unit |
| Others & DIP Provisions(est) | 1.75% | | $ 6,596 |
| | | Percent | |
| TOTAL ESTIMATED CLOSING COSTS PER UNIT | | 5.60% | $ 21,125 |

Year 4

DS Exh 3 Liq Analysis

| Chapter 7 Liquidation Analysis | | | Est. Amounts | Distributions |
|---|---|---|---|---|
| **Assets** | | | | |
| | Unsold Units | Quick Sale Value | 16,000,000 | |
| | Construction Litigation | Est. recovery | 5,000,000 | |
| | Subtotal | | 21,000,000 | |
| | | | | |
| Secured | Wells Fargo | 1st Lien | 22,000,000 | 21,000,000 |
| | | | | |
| Admin | Chapter 7 | Trustee | 210,000 | |
| | | Attorney for Tr. | 250,000 | |
| | Chapter 11 | Northen Blue | 30,000 | |
| | | Ward & Smith | 85,000 | |
| | Subtotal admin | | 575,000 | 0 |
| | | | | |
| Other | Weaver Cooke | 2nd Lien/Unsecured | 2,344,100 | 0 |
| | Unsecured | | 2,052,500 | 0 |
| | Contract Purchasers | | 0 | 0 |

Chapter 7